## In re TITUS.

(Supreme Court, General Term, Second Department. December 12, 1892.)

DISBARMENT OF ATTORNEY—EVIDENCE.

On proceedings to disbar an attorney it appeared that he had twice retained money collected by him, and once money of an estate intrusted to him for settlement, and that each time a judgment was obtained against him for the money wrongly retained. He had also retained funds given him by a client in a criminal case with which to effect a settlement with the prosecuting witness, and had been indicted for taking mortgaged property with knowledge of the mortgage. This latter case was, however, dismissed, owing to the

absence of a witness, and the prosecution was afterwards dropped. Respondent has also lately been sued by one S. for alienating the affections of his wife, and the evidence showed adultery with her on his part. *Held*, that respondent should be disbarred.

Petition to disbar George G. Titus, an attorney. Judgment of disbarment.

Argued before BARNARD, P. J., and DYKMAN and PRATT, JJ.

DYKMAN, J. This is a proceeding for a removal of an attorney from his office for professional misconduct. Charges were preferred against him, and a referee was appointed by this court to take testimony which might be offered on either side, and report the same to this court. The referee has performed his duty under the order, and returned the proofs, and reported the facts which he found, which are substantially as follows:

The respondent, George G. Titus, at all the times involved in this proceeding, practiced as an attorney and counselor at law in the courts of record of this state, and had an office for the transaction of business in the village of Pine Plains, Dutchess county, N. Y., and held himself out to be, and was consulted as, attorney and counselor at law. Upon the first charge of which evidence is given, in or about the year 1886, the respondent, Titus, was engaged by Amos Bryan to settle up an account due by Bryan to the firm of Wheeler & Melick Company, of Albany, to ascertain what amount they would accept in settlement or compromise. Titus was to go to Albany, and Bryan furnished him $350, which he conceded to be due. On his return from Albany, Titus informed Bryan that he did not have sufficient funds to settle with the firm, and on solicitation Bryan furnished him with a note of $200, payable to the Wheeler & Melick Company. Titus then returned to Albany, and brought him a release from the creditor, and delivered it to Bryan. In subsequent transactions with the Albany firm, Bryan ascertained that the note of $200, and only $150 of the $350 in money, had been delivered by Titus to them. Bryan made several demands upon Titus for the deficiency. Titus claimed that he did not have the money, and Bryan subsequently instituted a proceeding to compel Titus to refund the $200. The hearing in this proceeding was had before Mr. Justice Barnard at a special term, who, after hearing the proofs of the parties, directed that Titus refund the $200 to Bryan. This order was complied with, and a full settlement was effected, Titus receiving $75 for his services and disbursements in negotiating the settlement between Bryan and the Albany firm.

On the second charge the referee reported the following facts: On or about the 7th day of February, 1887, Titus received for collection a note made by Nelson J. Funk to the order of the Sicamore Marsh Harvester Company, of Nebraska. Titus wrote to Funk, who was a farmer in the town of Pine Plains, Dutchess county, demanding payment of the note. Funk called upon Titus after the demand, and paid him $101, being the amount due for principal and interest on the note, and Titus delivered the note to Funk, the maker. This payment was made

by Funk's note to Titus, which was subsequently paid in two renewals of three months each. Titus remitted to the bank $10. There is no evidence as to when he came into possession of the whole money. Whether he discounted Funk's note, or whether he received it after the renewals of the note, the fact appears in Funk's testimony that a portion of it was paid at the first renewal. On October 15, 1887, Mr. Wodell, attorney for the State Bank at Madison, Wis., through which the note had passed, demanded of Titus the money collected by him, less his fees, except the $10 which he had remitted. This demand was not complied with, and a proceeding was instituted entitled "In the Matter of the Claim of the State Bank of Madison, Wis., against George G. Titus, an Attorney, to compel the payment of the money collected." A hearing was had in this proceeding on October 29, 1887, before Mr. Justice Barnard, at a special term, and the court on that day made an order requiring Titus to pay the money theretofore collected by him from Funk to the attorney for the claimant. The court found that he should account for $98.45, less $10 paid in; also allowed to Titus $20 as fees in and about the collection. The balance, $68.45, Titus was directed by the order to pay, with interest thereon from the date of collection, and $10 cost of the motion.

On the third charge the referee found the following facts: That, in the fore part of the year 1890, Fred Barton, of Pine Plains, Dutchess county, retained Titus to defend him in a criminal action, based on a charge of assault upon Estelle Scott. At the time of the employment Mr. Barton paid Titus $10. A hearing was had before a justice at Weaver Hollow, several miles from Pine Plains, which Titus attended. The matter was postponed, and Titus advised his client Barton that if he was in Connecticut, and the case was called, it would not be tried. Titus afterward, went to Hudson, and consulted the county judge with reference to some point in the case. Barton then left $75 with Titus to settle the case with the complainant, and fled to Connecticut. The agreement between Titus and Barton was that Titus was to effect a settlement, if possible, for an amount not exceeding $70, and retain $5 for additional services. In case no settlement was effected, Titus was to deposit the $70 to Mr. Barton's credit in the Rhinebeck Savings Bank. A settlement was not made, and Barton, from his retreat in Connecticut, authorized his brother Frank to obtain the money from Titus. Frank Barton called upon Titus, who gave him a draft for $50, which was deposited in the Rhinebeck Savings Bank. Titus retained for his services $20 in addition to what it was agreed he should have, which Fred Barton claims is still due him. Frank Barton signed a receipt for $40, which was introduced in evidence.

On the next charge the referee reported as follows: In the year 1878 or 1879 Richard Peck, of Pine Plains, died intestate, and his sister, Jane A. Smith, was appointed administratrix of his estate. Titus was retained by her to manage the affairs of the estate, who, as appears by his bill received in evidence, rendered services to the estate in procuring the appointment of the administratrix, making collections, foreclosing mortgages, and managing the estate. In 1880, when Mrs. Smith sought

an accounting with Titus, he admitted having received $7,678.10. Mrs. Smith had paid him $3,400, and he collected, in addition to that, $4,278. He then presented a claim for services to Mrs. Smith as administratrix, which is in evidence, for $15,000. He credited Mrs. Smith with $7,678.10 and $250, the value of the library, and claimed a balance due him of $7,171.90. Mrs. Smith instituted proceedings against Titus to compel the payment of estate moneys, and the matter was tried before Mr. Justice Barnard at special term, who on February 25, 1881, made an order directing Titus to pay to Mrs. Smith the sum of $3,664. The matter was finally settled by a payment being made to Mrs. Smith of $3,000.

On the next charge the referee further reported as follows: For several years prior to June, 1890, Jacob Duntz held a chattel mortgage upon the personal property, including a bay horse, of Andrew Burger. Both mortgagee and mortgagor resided in Columbia county. In June, 1890, the mortgagee gave notice of the sale of the property secured by the mortgage, to take place on June 19th. On the morning of June 18th preceding, Burger, the mortgagor, went to Pine Plains, and consulted with Titus concerning the sale. Previous to this, Burger had procured a copy of the chattel mortgage from the town clerk's office, and delivered it to Titus. On the 18th of June, 1890, Titus, accompanied by Benjamin Risedorf, went to Mr. Burger's residence, and Titus told him he had come to look at the bay horse. Burger produced the horse, and, in the conversation, Titus wished Burger to be responsible to Duntz, the mortgagee, for the horse. The animal was returned to the lot, but was again brought out, and Burger handed the halter to Titus, saying that he, Burger, owed Titus, and wanted him to have it. Titus and Risedorf then took the horse to Pine Plains, where it was put in Titus' stable. Duntz, the mortgagee, went to Burger's residence the following day, and after selling all the property except the horse, went to Pine Plains, and saw the animal in Titus' stable. Duntz then procured a warrant for the arrest of Titus, who was arraigned before a justice of the peace on a charge of grand larceny, and held under bail to await the action of the Columbia county grand jury. Duntz also instituted an action in replevin against Titus to recover the horse, which was not defended, and the animal remained in Duntz's possession. The criminal proceeding came before the grand jury of Columbia county, and the jurors, after considering the evidence, the minutes of which are here introduced, found an indictment of grand larceny against Titus. This indictment was moved by the district attorney, Cochrane, at a regular term of the court of sessions for Columbia county in November, 1890, and was dismissed by the presiding judge on motion of the counsel for the accused, as the prosecution did not proceed by reason of the absence of Burger, one of the witnesses. A physician's certificate that Mr. Burger was unable to attend the trial by reason of illness was produced on the motion. The matter was not thereafter brought before any court or jury.

On the last charge, which presents the petitioner's individual grievance, the referee reported as follows: Herman Snyder and his wife,

Mary Snyder, were married about 12 years ago, and subsequently lived in New York city, Millerton, Shekomeko, and Pine Plains.   Snyder, during the period down to the removal to Pine Plains, left his wife for several months on two occasions to maintain herself and two children.   Snyder's occupation was a bartender, and he was in the habit of drinking to excess and gambling.   Upon leaving Shekomeko, where he had conducted a saloon, he and his family moved into apartments in Titus' barn at Pine Plains.   After living there a month, Snyder again left his wife and children, and was absent and apart from them for a period of three years and four months.   During his absence Mrs. Snyder worked in the Titus house and for other families.   When Snyder returned, Titus' wife had left him, and the Snyder family went to live in the Titus house.   Titus agreed to pay Mr. and Mrs. Snyder four dollars a week and give them the rent, and they, in consideration of this, were to board him.   Snyder obtained employment about half a mile from the house.   On returning home evenings he frequently found Titus and Mrs. Snyder together in the kitchen or library.   One evening, on returning home about 11 o'clock, Snyder noticed that the light in Titus' bedroom on the upper floor was turned low, as was also the light in the Snyder bedroom.   The bedroom where the Snyder children slept was also located on the same floor as the Titus bedroom.   On entering the house, Snyder found his wife's clothing on a chair in their bedroom, and shortly afterwards she came downstairs in her night clothing.   Titus was in his bedroom at the time.   One Sunday in February last, while Titus and Mrs. Snyder were at church, Snyder entered Titus' bedroom, and found, in one of the drawers used by Titus, three implements used in intercourse to prevent conception, which had the appearance of having been used.   Soon after this, Snyder told Titus he would move as soon as he found a place for his family.   The following day, Titus demanded the key from Snyder, and Snyder refused to give it up.   Titus told Snyder if he came in the house again it would be at his own peril.   Several days after this, Snyder gave up the key, leaving Mrs. Snyder with the children in the Titus house.   They have lived there down to the present time, Mrs. Snyder acting in the house as housekeeper, and receiving $2.50 per week and the support of herself and children.   Snyder has commenced an action against Titus to recover damages for alienation of his wife's affections, and, shortly after the papers in that action were served, Mrs. Snyder brought an action for separation on the ground of desertion and failure to provide.   Both actions are now pending.

The facts found by the referee are a mild condensation of the evidence, and they convict the respondent of misconduct of great enormity. They prove him guilty, not only of conduct unbecoming his profession, but fraudulent and deceitful towards his clients, and offensive to the criminal law.   The office of an attorney and counselor at law, with all its privileges and opportunities, is a valuable franchise, to be intrusted only to men of approved integrity and high moral character.   All sorts and conditions of people seek his advice and abide by his counsel, and, as an officer of the court, he must be faithful and trustworthy.   The purity and integrity of the profession must be preserved, and the courts

must maintain a high standard of honor. Its officers are aids in the administration of justice, and they must enjoy its confidence. It would be unprofitable and severe to comment upon the facts found by the referee. Their recitation is sufficiently painful without the aggravation incident to an analysis. Three of the charges against the respondent have been adjudicated by a justice of this court, and his guilt is beyond question. He is shown to be a man entirely unworthy of his great office, and he should be removed therefrom, and disbarred from practicing as an attorney at law. All concur.